Charles Edward RICHTER, Plaintiff

v.

State of MARYLAND, et al., Defendants.

Civil No. AMD 07–2707.

United States District Court, D. Maryland.

Dec. 22, 2008.

Robin R. Cockey, Cockey Brennan and Maloney PC, Salisbury, MD, for Plaintiff.

Daniel Karp, Karpinski Colaresi and Karp PA, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION and ORDER

ANDRE M. DAVIS, District Judge.

The central issue this case presents is whether, as required to sustain a § 1983 damages action based on the First Amendment, a local law enforcement officer violates "well-settled law" (as of October 2004) when he issues violation notices under a state motor vehicle code in retalia-

tion for repulsive, but undeniably political, speech by the owner of a motor vehicle. Plaintiff Charles Richter ("Richter") has brought such a claim here against, *inter alia*, Deputy Sheriff James Beatty ("Beatty") of Queen Anne's County, Maryland. (Plaintiff also alleged claims for denial of his substantive and procedural due process rights under the Fourteenth Amendment and under state law.) Discovery has concluded and now pending is Beatty's motion for summary judgment. The issues have been fully briefed and no hearing is necessary. For the reasons stated below, the defendant's motion for summary judgment shall be granted in part and denied in part.

## I.

The facts must be viewed, as always, most favorably to the non-movant, here the plaintiff. Richter is a resident of Queen Anne's County. On October 8, 2004, Richter decorated his 1988 Chevrolet Beretta (the "Beretta") with swastikas and the words "Vote for Pipkin" in large letters. He also taped a letter to then-Governor Robert Ehrlich and his own phone number on the car, and parked the Beretta on Pier One Road facing east, about 50 feet west of State Route 8. Richter chose this location because it was a popular campaign location for many politicians, including Maryland State Senator E.J. Pipkin, a local elected official whom Richter opposed. There is no dispute that the car was parked legally and it was in operable condition.

Shortly after Richter parked the Beretta, the County Sheriff's Office received a call from someone affiliated with Senator Pipkin's office. The caller reported that the displays on the Beretta were hurtful to Senator Pipkin (whose wife is Jewish) and to his family. In response to the call, Beatty inspected the car. After surveying the scene, Beatty asked his supervisor, Corporal Gery Hoffman ("Hoffman"), to come to the scene. When Hoffman ar-

rived, he called the Office of the County State's Attorney to describe the circumstances. He received advice to the effect that there was no apparent criminal law violation.

Notwithstanding this advice, Hoffman directed Beatty to issue a repair order for a cracked windshield and to place an "unattended vehicle tag" on the vehicle. Beatty did as he was told, leaving the violation notices on the vehicle. Richter first saw the tickets at six a.m. on the following day, October 9, 2004. He called several police agencies, arguing (1) that the vehicle was not "abandoned," i.e., "unattended," and (2) that it was improper to issue the repair order for a cracked windshield because: (a) the car was not being operated at the time it was ticketed; and (b) the order was not issued directly to the driver. Indeed, as discussed *infra*, it is clear that the issuance of the repair order was unwarranted. Furthermore, drawing all inferences in favor of plaintiff, there is no reason to believe that the vehicle was an "abandoned vehicle" within the meaning of Maryland law.

Despite plaintiff's contentions, on October 10, 2004, Beatty returned to the Beretta and noted that, in his judgment, it was in the same location as it was 48 hours earlier; therefore, having been unmoved for the requisite period, it could be towed. Disputing this conclusion, Richter asserts that, during the interim, he had indeed moved the car, but he concedes that while the car was not in the "exact same spot," it was in "the same general area," and that the car was "within a few feet or yards at the most" of where he had parked it on October 8, 2004. *Richter Dep. at 16.* In any event, Beatty notified his supervisor that the vehicle had not been moved, and the Sheriff's Office dispatched a towing company to remove the Beretta.

Richter learned that the car had been towed on the same day, October 10. He

determined its location and went to the impound lot. When Richter arrived at the lot, he signed several documents acknowledging that he had three weeks to pay a one-hundred dollar towing fee and pick up the vehicle or it would be destroyed. Richter never paid the fee. In February 2005, Richter's car was compacted at the direction of the Sheriff.

Meanwhile, also on October 10, 2004, Richter decorated a new car, this time a van, with the same messages that he had painted on the Beretta. He parked his van in the same location as where the Beretta had been parked. Richter took the van home every night and it was never ticketed or towed.

Plaintiff filed this action on October 5, 2007, seeking injunctive and declaratory relief and compensatory and punitive damages. The court granted motions to dismiss filed by the State of Maryland and the County Sheriff. Beatty filed no motion to dismiss but answered the complaint and the court deemed that answer as also answering plaintiff's amended complaint.

## II.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## III.

### A.

■ In the Fourth Circuit, a plaintiff seeking to recover on a First Amendment retaliation claim must prove the following elements: (1) he engaged in protected First Amendment activity; (2) the defendants took some action that adversely affected his First Amendment rights; and (3) there was a causal relationship between his protected activity and the defendants' conduct.[1] *Constantine v. Rectors and Visitors of George Mason Uni.,* 411 F.3d 474, 499–500 (4th Cir.2005) (quoting *Suarez*

---

**1.** The Court in *Constantine* elaborated:

First Amendment retaliation is actionable because "retaliatory actions may tend to

Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir.2000)). Here, although defendant concedes that Richter engaged in protected First Amendment activity, he contends that plaintiff fails to project evidence sufficient to establish the second and third elements of his claims. I disagree.

1.

 Courts determine whether an action adversely affected First Amendment rights by evaluating whether the conduct would deter a person of ordinary firmness from engaging in similar speech, referred to here as "car speech."[2] *Constantine,* 411 F.3d at 500 (4th Cir.2005). It is an objective test. Here, Richter asserts that the threat of having one's car immediately ticketed and subsequently towed and destroyed by law enforcement officers would have a chilling effect on "car speech."

People of ordinary firmness would likely refrain from putting political speech on their cars if they thought that they would suffer immediate retaliation in the form of a repair order and/or an "abandoned vehicle" tagging. *See, e.g., Garcia v. City of Trenton,* 348 F.3d 726, 727 (8th Cir.2003) (upholding a jury verdict that found that issuing parking tickets to a business owner in retaliation for political speech chilled the

chill individuals' exercise of constitutional rights." *ACLU of Md., Inc. v. Wicomico County, Md.,* 999 F.2d 780, 785 (4th Cir. 1993). Not all retaliatory conduct tends to chill First Amendment activity, however, *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995), and a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a "de minimis inconvenience" to her exercise of First Amendment rights, *ACLU of Md.,* 999 F.2d at 786 n. 6. Of course, conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, and a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation.

speech of a person of ordinary firmness). Here, Beatty ticketed Richter's car as ostensibly abandoned and put a repair order on the car the same day that Richter parked it, legally, on a public street, as an act of political protest. Based on the initial ticketing, Richter was required to move his car within 48 hours (to avoid towing) and incur the cost to repair his windshield.[3] Since many cars are driven in less than perfect condition, the requirement to repair the car could be onerous and expensive.

Thus, it is no stretch to conclude that people of ordinary firmness might refrain from "car speech" if they believed that doing so would likely require them to move their car more frequently than normal and keep their car in near-perfect condition at all times. Certainly, there is sufficient evidence here to permit a reasonable jury to make that conclusion. Nor is the court persuaded by Beatty's argument that Richter's speech was not *actually chilled* by his issuance of the two violation notices. As previously stated, the test is an objective one and not a subjective test. Consequently, the operative standard is whether the retaliation would give pause to a person of ordinary firmness, not to Richter in particular. Additionally, the Fourth Cir-

*Constantine v. Rectors and Visitors of George Mason Uni.,* 411 F.3d 474, 499–500 (4th Cir. 2005).

**2.** "Car speech" is to be distinguished from "Car Talk," the radio show on National Public Radio hosted by the notorious Tappert Brothers. Tom and Ray Magliozzi, *Car Talk* (National Public Radio), *available at* http://www.cartalk.com/.

**3.** Under Maryland law, car owners who receive "repairs orders" must have the equipment corrected within 10 days from the issuance of the order and either (1) send the police a repair certification; or (2) request that the police make a visual inspection of the vehicle. MD.CODE ANN. TRANS. § 23–105(C) (2000).

cuit has clearly articulated on several occasions that retaliatory action need not actually freeze speech entirely to be actionable. *See, e.g., id.* at 499 ("We have never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether. The cause of action targets conduct that tends to chill such activity, not just conduct that freezes it completely."). Accordingly, plaintiff has projected sufficient evidence to establish the second element of his claim.

2.

■ The third element of plaintiff's First Amendment retaliation claim asks whether there was a causal relationship between Richter's protected activity and Beatty's enforcement conduct in placing the violation notices on the vehicle. *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 686 (4th Cir.2000). Beatty asserts that Richter has failed to project any evidence on this issue. This is not true. The record shows that Deputy Beatty specifically went to the scene as a direct result of a complaint about the *content of the speech*

on Richter's car: a member of Senator Pipkin's organization complained that the speech on Richter's car was offensive and hurtful to Senator Pipkin and to his family. Before taking any action, Beatty contacted his supervisor, Hoffman, who then called the Office of the State's Attorney to see if the circumstances presented a violation of criminal law. As mentioned, Hoffman learned that Richter was not violating any criminal law. Apparently, Hoffman determined, on his own, to direct Beatty to issue the disputed citations as a last resort.[4] These undisputed facts constitute direct and circumstantial evidence that Beatty (or Hoffman, as Beatty claims that in ticketing the car, he was following Hoffman's orders) was motivated by the content, place and manner of Richter's "car speech," to take enforcement action designed to remove the vehicle from its highly public location and thus to squelch the speech contained upon it.

A reasonable juror could also take into account, on the causation issue, Beatty's failure to provide a legitimate reason for initially ticketing Richter's car.[5] Clearly,

4. The court is not sure why Richter has never sought to amend his complaint to name Corporal Hoffman as a defendant in light of Beatty's casting of all decision-making in this case on Hoffman. Beatty followed Hoffman's lead because, as Beatty explained on deposition, handling the Richter vehicle issue was "above [his] pay grade." Of course, the mere fact that Beatty acted unconstitutionally because he was ordered by a superior to do so provides no basis for exoneration of Beatty, the officer who actually issued the violation notices.

5. In *Hartman v. Moore,* 547 U.S. 250, 260–61, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006), the Supreme Court considered the issue whether lack of probable cause is an element of a plaintiff's constitutional tort claim for retaliatory prosecution. In holding that lack of probable cause is indeed an element, the Court explained the relevance to the issue of causation of evidence of probable cause (and

the lack thereof) in such cases, which may be analogized to traffic law enforcement:

Like any other plaintiff charging official retaliatory action, the plaintiff in a retaliatory-prosecution claim must prove the elements of retaliatory animus as the cause of injury, and the defendant will have the same opportunity to respond to a prima facie case by showing that the action would have been taken anyway, independently of any retaliatory animus. *What is different about a prosecution case, however, is that there will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge. Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence*

notwithstanding its patent offensiveness, the speech on Richter's car was not criminal, *Beatty Dep. at 28–30,* and it is undisputed that the car was legally parked. *Id.* at 31. Furthermore, as a matter of law, the car could not reasonably be viewed as an "abandoned vehicle" as defined by Maryland law. *See* MD.CODE ANN. TRANS. 25–201(b)(1) (2000) (defining an abandoned vehicle as, *inter alia,* any motor vehicle that is "inoperable and left unattended on public property for more than 48 hours").[6] Richter parked his car on the property the same day that Beatty ticketed it. There is

> *of probable cause will suggest that prosecution would have occurred even without a retaliatory motive.* This alone does not mean, of course, that a *Bivens* or § 1983 plaintiff should be required to plead and prove no probable cause, but it does mean that litigating probable cause will be highly likely in any retaliatory-prosecution case, owing to its powerful evidentiary significance.
>
> *Id.* at 260–61, 126 S.Ct. 1695 (emphasis added). In this case, there was no probable cause to attach the violation notices to Richter's vehicle.

**6.** Defendant has not suggested that any of the other statutory definitions of "abandoned vehicle" might be applicable:

(b) "Abandoned vehicle" means any motor vehicle, trailer, or semitrailer:

(1) That is inoperable and left unattended on public property for more than 48 hours;

(2) That has remained illegally on public property for more than 48 hours;

(3) That has remained on private property for more than 48 hours without the consent of the owner or person in control of the property;

(4) That has remained in a garage for more than 10 days after the garage keeper has given the owner of the vehicle notice by certified mail, return receipt requested, bearing a postmark from the United States Postal Service, to remove the vehicle;

(5) That has remained in a garage for more than 10 days after the period when, by contract, the vehicle was to remain in the garage;

(6) That was left for more than 10 days in a garage by:

no reason to believe that he (or Hoffman) actually believed that it was an "abandoned vehicle." [7]

Nor did the vehicle warrant the issuance of a safety equipment repair order because, while it was legally parked, it was not "being operated." *See* MD.CODE ANN. TRANS. § 23–105 (2000) ("*If a police officer observes that a vehicle registered in this State is being operated* with any equipment that apparently does not meet the standards established under this subtitle or the standards established under § 24–

(i) Someone other than its registered owner; or

(ii) A person authorized to have possession of the vehicle under a contract of use, service, storage, or repair;

(7) That has remained on public property for more than 48 hours and:

(i) Is not displaying currently valid registration plates; or

(ii) Is displaying registration plates of another vehicle;

(8) That has been left unattended on any portion of a "controlled access highway" as defined in § 8–101(f) of this article for more than 24 hours;

(9) That has been left unattended on any portion of a primary or secondary highway or controlled access highway, as defined in § 8–101 of this article, and is in violation of any of the provisions of § 22–408 of this article; or

(10) That is not reclaimed as provided under § 27–111 of this article.

MD.CODE ANN. TRANS. 25–201(b) (2000).

**7.** It appears that the only rational explanation of how Hoffman concluded that the vehicle could be ticketed as an "abandoned vehicle," i.e., that the car was "inoperable," is because the windshield had a crack in it. Manifestly, this bootstrapping is unavailing as mere *ipse dixit.* A cracked windshield may render a vehicle "inoperable" in the sense that, once a repair order is issued to the operator of such a vehicle, unless the repairs are completed, the vehicle may not *lawfully* be operated. This is a far cry from the *mechanical inoperability* which is plainly the basis of an *abandoned vehicle* citation.

106.1(e) of this article, the officer shall stop the driver of the vehicle and issue to him a safety equipment repair order.") (emphasis added). On deposition, Beatty conceded that the car was not inoperable—it was just unwise to operate it with the crack in the windshield. *Beatty Dep. at 30–31.*

Thus, in light of the transparently pretextual justifications for Beatty's issuance of the two citations, a reasonable juror could reasonably conclude that Richter's car was actually ticketed because Beatty (or Hoffman) wanted to take (or felt compelled by the complaints of Senator Pipkin's representative to take) some adverse action against Richter in retaliation for the repulsive speech plastered on his car. (Moreover, the inference is further bolstered by the fact that, according to Richter's unrebutted testimony, local law enforcement did not act promptly (or at all) when, in the past, Richter had reported abandoned cars.) [8] Thus, plaintiff has projected substantial evidence as to the third element of his First Amendment retaliation claim.

### 3.

For all these reasons, the court concludes that plaintiff has generated genuine issues of material fact as to whether the initial ticketing of the Beretta was caused by the speech contained on (and the lawful placement of) Richter's car, and whether people of ordinary firmness might experience a chilling of their First Amendment right to speak as a result. Accordingly, the motion for summary judgment shall be denied insofar as defendant asserts that

plaintiff has failed to marshal sufficient evidence to prevail on the merits of his First Amendment retaliation claim.

### B.

Richter also brings a claim for violation of his right to procedural due process under the Fourteenth Amendment. To prevail on this claim, he must establish that (1) he possessed property or a property interest and that (2) the government denied him of that right (3) without due process of law. *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 826 (4th Cir.1995); *Smith–Berch, Inc. v. Baltimore County, Md.,* 68 F.Supp.2d 602, 627 (D.Md.1999). Here, Richter owned his car and the government deprived him of that property when it destroyed his car. But Richer cannot establish any genuine issue of material fact as to the third element of his claim because he was not denied due process of the law.

Richter had notice and a fair opportunity to be heard throughout this process. When his car was first ticketed, Beatty called Richter to personally notify him of the ticket and told him that he needed to either move or remove the car within forty-eight hours. Richter did not move his car—at least not more than a few feet or yards—so after forty-eight hours, the car was towed.[9] Thereafter, Richter located his car and he was further advised of the process available to him to retrieve his vehicle: he needed to pay $100 within three weeks or else his car would be destroyed. Richter chose not to pay (or to

---

8. Richter swore in this deposition that the police did not respond to his reports of abandoned cars. He swore that:

> any abandoned car I seen, I complained about to the Maryland State Police and to the sheriff's department. One in particular was on Route 50 westbound, between Holly's [sic] and the bridge was abandoned, left there in a hazardous situation for ten days,

and I reported it to the state police and the sheriff's department almost every day. *Richter Dep. at 30–31.*

9. Beatty claims that he called Richter a second time to alert him that his car was towed. Richter denies that he ever recceived a second phone call. Even accepting Richter's version of the facts as true, Richter still had ample notice in this case.

file an action to enjoin the destruction of the vehicle) and because of that choice, his car was crushed. Richter could have brought suit while his car was impounded *before* it was crushed, *see Mora v. The City Of Gaithersburg, MD,* 519 F.3d 216, 230 (4th Cir.2008) (granting summary judgment on plaintiff's procedural due process claim because plaintiff failed to avail himself of the state court system). As a matter of law, Richter's failure to take advantage of readily available procedural opportunities to avoid the destruction of his vehicle forecloses his claim that he was deprived of his procedural due process rights.

## C.

Richter also asserts a substantive due process claim under the Fourteenth Amendment. The Fourth Circuit defines substantive due process as "an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement those actions." *Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal, Virginia,* 135 F.3d 275, 287–88 (4th Cir. 1998). This check "is warranted only where no process could cure the deficiencies in the governmental action. In other words, governmental action offends substantive due process only where the resulting deprivation of life, liberty, or property is so unjust that no amount of fair procedure can rectify it." *Id.* Thus, this claim requires that the state act in an arbitrary and irrational way, unjustified by any possible government interests. *Mora,* 519 F.3d at 230 (citing *Rucker v. Harford County, Md.,* 946 F.2d 278, 281 (4th Cir. 1991)).

This high standard is not remotely satisfied here. The towing of a car, even on a an erroneous or pretextual basis, simply does not rise to the level of violating substantive due process rights. Although the court recognizes that the gov-

ernment may have caused Richter some minor inconvenience, minor inconveniences are insufficient for this type of claim. Additionally, as mentioned above, procedures were readily available that could have easily avoided the inconvenience arising from permanent loss of the vehicle. Accordingly, the substantive due process claim fails.

## IV.

Defendant Beatty asserts that, even if plaintiff has projected sufficient evidence to establish a constitutional violation, qualified immunity bars plaintiff's claims. Qualified immunity shields government officials who undertake discretionary functions from civil liability as long as their conduct does not violate clearly established constitutional rights. *Orem v. Rephann,* 523 F.3d 442, 445 (4th Cir.2008) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

In assessing qualified immunity, the court employs a two-pronged analysis. *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The threshold question is whether the facts, viewed in a light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. *Id.* at 201, 121 S.Ct. 2151. If a violation has occurred, the second step requires the court to consider whether the right was clearly established, measured by "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* An official action is not protected by qualified immunity if the very action in question has previously been held unlawful, nor if the unlawfulness is apparent in the light of pre-existing law. *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Thus, an official can be on notice that his conduct violates established law even in novel factual circumstances if the state of law at the

time of the events gave the official "fair warning" that his or her conduct violated the constitution. *Id.* at 741, 122 S.Ct. 2508.

■ In the Fourth Circuit, when qualified immunity from suit is asserted, "[t]he plaintiff bears the burden of proof on the first question—*i.e.*, whether a constitutional violation occurred .... [and][t]he defendant bears the burden of proof on the second question—i.e., entitlement to qualified immunity." *Henry v. Purnell,* 501 F.3d 374, 377–78 (4th Cir.2007) (internal citations omitted). Since this court has dismissed the substantive and procedure due process claims, plaintiff has only satisfied his burden of proof as to his First Amendment retaliation claim.

■ Defendant has failed to satisfy his burden to show he is entitled to qualified immunity. There is no doubt that the broad legal principle governing this case— the right to free speech free of governmental retaliation—was clearly established at the time that Beatty ticketed Richter's Beretta. *See Crawford–El v. Britton,* 523 U.S. 574, 590–91, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (describing the "general rule" that "the First Amendment bars retaliation for protected speech" as one that "has long been clearly established"). At this stage of the analysis, however, the court must narrow its focus, as the determination of whether a given right is clearly established requires the court to analyze the situation at a high level of particularity. *Campbell v. Galloway,* 483 F.3d 258,

271 (4th Cir.2007); *Edwards v. City of Goldsboro,* 178 F.3d 231, 247, 251 (4th Cir.1999). In determining "[w]hether a right has been specifically adjudicated or is manifestly apparent from broader applications of the constitutional premise in question," this court may consider decisions of the Supreme Court, the Court of Appeals for the Fourth Circuit, and the Court of Appeals of Maryland. *Owens ex rel. Owens v. Lott,* 372 F.3d 267, 279 (4th Cir.2004).

At the proper level of particularity, the issue here is whether it was clearly established in October 2004 that the selective application of facially neutral traffic regulations to squelch undesirable "car speech" could give rise to liability under the First Amendment. I am persuaded that the answer is "yes." *See Blankenship v. Manchin,* 471 F.3d 523 (4th Cir.2006).[10]

Of particular importance here is the fact that in *Blankenship,* the Fourth Circuit cited and relied heavily on an Eighth Circuit case in its analysis of whether the plaintiff properly alleged a constitutional violation. *Id.* at 531 (citing *Garcia v. City of Trenton,* 348 F.3d 726, 727–29 (8th Cir. 2003)). In particular, the Fourth Circuit relied on *Garcia* as illustrative of an unequivocal example of improper government retaliation for protected speech. *Id.*

In *Garcia,* the Eighth Circuit held that the evidence presented during a jury trial was sufficient to show that issuing parking tickets to a business owner in retaliation

---

10. In *Blankenship,* the Fourth Circuit affirmed the district court's decision that a sitting Governor is not entitled to qualified immunity at the motion to dismiss stage for allegedly threatening a political rival and prominent businessman during a press conference. *Blankenship v. Manchin,* 471 F.3d 523, 525 (4th Cir.2006). A coal-industry executive sued the Governor for publically threatening to cause state regulators to exercise greater scrutiny over his company in retaliation for that executive's public opposition to one or more of the Governor's proposals. *Id.* On interlocutory appeal from the denial of a motion to dismiss based on qualified immunity, the Court found that the facts established that the Governor threatened imminent adverse regulatory action and that a reasonable person in his position would know that such a threat is unlawful. *Id.* at 528 (citing *Suarez Corp. Industries v. McGraw,* 202 F.3d 676, 689 (4th Cir.2000)).

for political speech could chill the speech of a person of ordinary firmness. *Garcia*, 348 F.3d at 727. Garcia regularly parked her car in front of her place of business from November 1999 until August 30, 2000. *Id.* at 728. She never received a ticket, despite the fact that she parked in violation of the two-hour limit, because it was police policy not to ticket unless someone complained about a parking violation. *Id.* On August 30, 2000, however, within hours after having a heated exchange with the Mayor about an issue of local law enforcement policy,[11] Garcia received her first parking ticket, and continued to receive tickets on a regular basis. *Id.* Garcia received four tickets that, in sum, generated thirty-five dollars in fines. *Id.* at 729.

The court found that a reasonable jury could conclude that traffic tickets totaling $35 could dissuade people of ordinary firmness from continuing to exercise their First Amendment rights. Noting that even though the effect on freedom of speech was small, the court noted that an infraction need not be great since there is no justification for harassing people for exercising their constitutional rights. *Id.* Here, the charges from the parking ticket were sufficient. In sum, *Garcia* stands for the premise that the selective application of facially neutral traffic regulations to squelch undesirable speech gives rise to liability under § 1983 for actions taken in retaliation for the exercise of First Amendment rights—the precise issue in dispute in this case.

Accordingly, Beatty's actions taken in October 2004 violated clearly established law. Although *Garcia* was not discussed approvingly by the Fourth Circuit until after Beatty issued Richter the 48–hour tow notice and repair order, there is no indication in *Blankenship* that the Fourth Circuit found *Garcia*, decided in 2003, to represent a novel or unexpected application of settled Supreme Court precedent. To the contrary, the rule applied in *Garcia* flows naturally from clearly established Supreme Court authority which would have been well known to a reasonable law enforcement officer in October 2004. *See, e.g., Trulock v. Freeh*, 275 F.3d 391, 405–406 (4th Cir.2001) (holding that a former government official's complaint sufficiently pleaded a claim for retaliation under the First Amendment when defendants searched plaintiffs' home and computer in retaliation for a magazine article that was critical of the FBI).[12] Accordingly, as a matter of law, defendant here is not entitled to qualified immunity in respect to

---

**11.** Garcia discussed a local bicycle ordinance with then-Mayor Whitaker. *Garcia v. City of Trenton*, 348 F.3d 726, 727–29 (8th Cir.2003). The bicycle ordinance prohibited bikers from riding on the sidewalk in front of her shop, and Garcia wanted it enforced. *Id.* at 728. She complained about the lack of enforcement to Mayor Whitaker, other city officials, a state representative, and a state senator. *Id.*

**12.** In *Trulock*, the Court stated:
 It is well established that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right. *Suarez v. McGraw*, 202 F.3d 676, 685 (4th Cir.2000); *accord Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998). This holds true even when

the act of the public official, absent the retaliatory motive, would otherwise have been proper. *ACLU*, 999 F.2d at 785. Thus, we hold that it was clearly established at the time of the search that the First Amendment prohibits an officer from retaliating against an individual for speaking critically of the government.
*Id.* at 405–406; *see also id.* at 405 n. 10 ("[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows-or should know-that much.") (citing *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir.1990)).

plaintiff's First Amendment retaliation claim.[13]

## V.

For the reasons set forth, the motion for summary judgment is GRANTED IN PART and DENIED IN PART.

---

13. The court has considered Richter's state law claims for trespass to chattel and conversion and concludes that for the reasons stated by defendant, those claims fail on the merits and that, in any event, defendant is entitled to statutory immunity under state law.